Filed 10/1/21  In re B.P. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.P., a Person Coming Under the Juvenile Court Law. | B307711 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP01243B) |
| Plaintiff and Respondent, | |
| v. | |
| C. P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Julie Blackshaw, Judge.  Affirmed in part and dismissed in part.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for B.P.

The court assumed dependency jurisdiction over nine-year-old B.P. following the death of her three-week-old half-brother, Maximus M. (Maximus). The court's jurisdiction finding was made solely pursuant to Welfare and Institutions Code section 300, subdivision (j),[1] which applies if (1) a dependent child's sibling has been abused or neglected as defined in other specified subdivisions of section 300 and (2) there is a substantial risk the dependent child will be abused or neglected as defined in those subdivisions. (*In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).) C.P. (Mother) appeals the jurisdiction finding and associated disposition order, asking us to decide whether (1) the juvenile court erred by not making an express finding as to the first of these two elements and (2) whether there is sufficient evidence of abuse or neglect of Maximus, a substantial risk to B.P.'s welfare, and detriment justifying B.P.'s removal from Mother's custody.[2]

## I. BACKGROUND

### A. *Maximus's Death*

On February 18, 2020, at approximately 6:00 p.m., Mother and Maximus's father (Stepfather) drove Maximus to Good Samaritan Hospital after he stopped eating, appeared pale, and had spasms. Maximus was rushed to the emergency room where

---

[1] Undesignated statutory references that follow are to the Welfare and Institutions Code.

[2] Our resolution of these issues makes it unnecessary to resolve the Department's cross-appeal challenging the juvenile court's decision to decline to assume jurisdiction under section 300, subdivision (b)(1). (See, e.g., *I.J.*, *supra*, at 773; accord, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

3

he was found to be "pulseless, apneic, limp, with central cyanosis and cool skin." The doctors performed cardiopulmonary resuscitation and revived Maximus. The attending physician observed Maximus was "severely hypothermic" and appeared to be "severely dehydrated and malnourished." The doctor also observed abrasions along his right jaw and above his right eyebrow.

Before transferring Maximus to Children's Hospital Los Angeles (CHLA), the emergency room doctor discussed with Mother the events leading up to Maximus's arrival at the hospital. Mother said that in the preceding days Maximus had been eating well (two ounces of formula every two hours), but in the hours before his cardiac arrest he displayed a decreased appetite.

After Maximus's transfer, CHLA asked the Los Angeles Police Department (LAPD) to conduct a child abuse investigation. The police separately interviewed Maximus's parents twice. Both parents described the same essential course of events related by Mother to an emergency room doctor: decreased appetite and then seizure-like movements (Maximus becoming suddenly "rigid" and "extend[ing] his legs and clench[ing] his hands" in the hours preceding his cardiac arrest). Neither parent could offer the police an explanation for Maximus's condition even though they were the child's only caretakers.[3]

---

[3]     Mother said she believed the abrasions on Maximus's face were caused by a new sweater with a zipper that Maximus wore for the first time earlier in the week and by the child scratching himself. The doctor who treated Maximus told police detectives the abrasions were "superficial" and "could have been caused by anything."

While the police took statements from the parents, a Los Angeles County Department of Children and Family Services (Department) social worker interviewed Maximus's attending physician at CHLA. The doctor said that Maximus, when admitted to the hospital, had "dilated non-reactive pupils, lack of spontaneous movement or respirations" and "bloody stools and bloody gastric output." Initial laboratory tests showed "severe metabolic acidosis and severe anemia." In his intake notes, the doctor opined: "It is unclear what precipitated the cardiac arrest, but given [the] bloody [gastrointestinal] output, [Maximus] may have had a volvulus several days ago resulting in significant blood loss and dehydration."[4]

Over the course of the next several days, Maximus's doctors ordered various consultations and a battery of diagnostic tests, including magnetic resonance imaging (MRI) studies of Maximus's brain and cervical spine. The brain MRI study showed an "extensive subarachnoid hemorrhage over both cerebral hemispheres, intraventricular hemorrhage in both ventricles and blood surrounding the cerebellum and brain stem extending into the upper cervical spinal canal." MRI study of Maximus's spine revealed an "extensive subarachnoid hemorrhage throughout the spinal canal." The doctors advised Maximus's parents that based on the diagnostic tests and clinical examinations it was "likely that [Maximus] would not walk, talk or interact with them in a meaningful way."

On February 21, 2020, after consulting with Maximus's doctors about his poor neurologic prognosis, Mother and

---

[4]     A volvulus is a twisting of a portion of the gastrointestinal tract that can impair blood flow.

Stepfather elected to have Maximus compassionately disconnected from his ventilator. Fifteen minutes after being extubated, Maximus died.

   B.   *The Dependency Petition and Subsequent Proceedings*

While Maximus was being treated at CHLA and shortly after his death, a Department social worker interviewed Mother, Stepfather, and the other members of their household: B.P., Mother's 17-year-old son M.P., her adult son Aldo P. (Aldo), and his partner Patricia C. (Patricia).

Mother and Stepfather described for the social worker the same course of events leading to Maximus's hospitalization that they described to hospital personnel and the police. The parents' version of the precipitating events was not contradicted by any of the other household interviewees. All of the interviewees, including B.P.—who was home at the time Maximus was rushed to the hospital—denied there had been any abuse of Maximus or any other child living in the home. B.P., Mother's older sons, and Patricia said Maximus's parents were "attentive" to the infant's needs and took "good care" of him. Although Aldo described Stepfather as "really calm" generally, he did say that three weeks earlier he saw Stepfather become frustrated and slam a door when Aldo's own child was crying. Hospital staff told the social worker of similar volatile reactions by Stepfather on other occasions: he slammed a door after being advised of CHLA's visitation policy and slammed his hand into a wall after learning of Maximus's poor prognosis.

The social worker interviewed B.P.'s father, Christopher P. (Father), who had been divorced from Mother for approximately seven years. Father said Stepfather had once used profanity

6

when discussing B.P. in an angry voicemail message he left on Father's phone.[5]  Father also advised he had seen Stepfather drinking and smoking marijuana in the front yard of the home Stepfather shared with Mother.  Stepfather admitted to the social worker that he smoked marijuana prior to Maximus's birth and he agreed to complete an on-demand drug test.  Later, however, stepfather reneged and refused to drug test.

The social worker also separately interviewed an emergency room doctor from Good Samaritan Hospital and the director of CHLA's CARES (Child Abuse Reporting Electronic System) team.  Both reported they suspected Maximus was a victim of child abuse due to the extensive brain bleeds, the blood around his brain stem, his malnourished state upon admission, and the fact that his parents' statement of events seemingly did not match his injuries.

A week after Maximus died, his parents agreed to submit to polygraph examinations.  Mother's examination was determined to be "negative" for deception.  Stepfather's examination, however, was found to indicate deception.  After the polygraph, Stepfather admitted causing Maximus's injuries in a statement to the polygraph examiner.  As recounted in a police report obtained by the social worker, Stepfather "explained to the polygraph examiner that he became angry with [Maximus] and 'lost control' for approximately five or ten minutes.  [Stepfather] grabbed [Maximus] by the arms and pulled him forcefully side to side, causing injuries.  [Stepfather] also grabbed [Maximus] by the legs and pulled him forcefully side to side, causing injuries."

---

[5]     Specifically, Father said Stepfather referred to B.P. as Father's "fuck[ing] daughter."

After the polygraph examination, the police arrested Stepfather for child abuse resulting in death (Pen. Code, § 273ab, subd. (a)).

Shortly thereafter, the Department filed a multi-count petition asking the juvenile court to take dependency jurisdiction over B.P.[6] The petition alleged six counts under section 300: one under subdivision (a) (risk of serious physical harm inflicted non-accidentally), two under subdivision (b)(1) (substantial risk of serious physical harm from a parental failure or inability to protect), one under subdivision (f) (parental causation of the death of another child through abuse or neglect), and two under subdivision (j) (risk of abuse or neglect when a sibling has been abused or neglected). All the counts alleged Maximus's injuries were "consistent with inflicted trauma."

At the detention hearing, Mother denied the allegations. The juvenile court ordered B.P. removed from Mother's custody and placed with Father. Mother was granted monitored visitation and Stepfather was prohibited from having any contact with B.P.

In advance of the jurisdiction hearing, a Department investigator interviewed Mother. She said that on the day of Maximus's hospitalization, she took a shower and left B.P. in Stepfather's care. When Mother finished showering, Stepfather told Mother he had put Maximus on the bed to calm him because he had become fussy and whiny. Over the course of the next several hours, Mother attempted to feed Maximus but he would not eat. Then, while changing his diaper, Mother noticed

---

[6] The petition as originally filed sought jurisdiction over both B.P. and M.P. However, when M.P. turned 18 years old, the juvenile court dismissed the petition as to him and the Department filed an amended petition limited to B.P. alone.

8

Maximus was pale and limp; that's when she and Stepfather took him to the hospital.

Mother said she had no explanation for Maximus's injuries or malnourished condition because, prior to the day of his hospitalization, his eating habits, bowel movements, and sleep patterns had been normal. Mother denied witnessing any abuse of Maximus by Stepfather. She had seen Stepfather playing with Maximus's hands and feet, but she never saw Stepfather do so in a rough or forceful manner. Mother did concede Stepfather would on occasion become impatient with Maximus when the child would not stop crying, but she said he would not mistreat Maximus and would seek Mother's assistance with the infant on those occasions. Mother also admitted she remained in communication with Stepfather even though she knew he had been arrested and the police reported he admitted abusing Maximus.

The dependency investigator also interviewed Stepfather. He stated that on the day of the hospitalization, while Mother was in the shower, Maximus woke up and began whining. Stepfather picked him up, burped him, checked his diaper, and tried to feed him. At some point, Maximus "tensed up, balled his fists, and started to cry," before falling back to sleep. Maximus also "tensed up" once more after Mother came out of the shower. The parents, at first, attributed Maximus's behavior to him trying to have a bowel movement. After noticing that Maximus was very pale below the waist, however, the parents decided to take him to the hospital. Stepfather admitted to playing with Maximus's arms and legs but he adamantly denied losing control and hurting Maximus. Stepfather also disputed he made any

incriminating statements after his polygraph examination; as Stepfather put it, the detectives had "chang[ed] his words."

The Department obtained medical records from Good Samaritan Hospital, CHLA, and Monterey Park Hospital (the hospital where Maximus was born). The records from Monterey Park Hospital showed that while Maximus was born several weeks early due to Mother's elevated blood pressure, there were no complications during the cesarean section delivery. Maximus's progress notes over the course of the next several days showed he was in stable condition with no respiratory distress and bonding with Mother. Three days after being born, Maximus was discharged home in stable condition.

Shortly before the jurisdiction hearing, the Department provided the juvenile court with a copy of Maximus's autopsy report, which concluded the cause and manner of death was "undetermined." The autopsy did not reveal any skeletal fractures, a finding that was confirmed by radiographic examination and consultation. Although the autopsy revealed, and a neuropathy consultation confirmed, a subarachnoid hemorrhage, the examiner stated the hemorrhage was "consistent with reperfusion hemorrhage of respirator brain. This means that the subarachnoid hemorrhage [wa]s not necessarily due to trauma." In view of these findings, the examiner concluded "non-accidental trauma cannot be ruled in." In the examiner's opinion, "[t]he possibility of volvulus is a strong consideration but it cannot be definitively ruled in, since it was not found at autopsy." The examiner, however, further observed "that volvulus has been known to resolve before imaging or autop[s]y can establish the diagnosis."

10

## C.    *Jurisdiction and Disposition Hearing*

At the combined jurisdiction and disposition hearing, the juvenile court admitted the Department's reports and their supporting exhibits (including the medical records and police reports) in evidence.  The Department elected not to call any witnesses, including the deputy medical examiner who performed the autopsy.

Mother moved to dismiss the amended petition, arguing the Department had not met its burden to prove Maximus's injuries were consistent with inflicted trauma.  Mother's attorney placed particular emphasis on the autopsy report and the examiner's finding that he could not rule in non-accidental trauma as the cause for the subarachnoid hemorrhage.  B.P.'s counsel joined the motion to dismiss, but only with respect to the petition counts alleged under subdivision (a) and (f).  The court granted the motion to dismiss in part, finding the Department had not met its burden of proof on the subdivision (a) and (f) counts because the medical examiner could not determine a cause of death.  The court also dismissed the b-2 and j-2 counts in the dependency petition, which alleged medical neglect by Mother, because the medical records showed "Mother went to all of the doctor appointments."

After conferring with counsel off the record, the court presented amended versions of the b-1 and j-1 petition counts with changes intended to conform to the proof presented, including the autopsy report.  In pertinent part, these amended counts alleged:  "At the time of his death, Maximus was found to have a focal contusion of the right forehead, focal abrasion under the right chin, cerebral edema, diffuse subarachnoid hemorrhages, severe metabolic acidosis, bloody gastrointestinal

11

output and possible volvulus. The autopsy report found the cause and manner of death to be undetermined. [Stepfather], father of the deceased half-sibling Maximus, has admitted that he inflicted injuries to the half-sibling by becoming angry and losing control while caring for Maximus and pulling him forcefully from side-to-side by his arms and legs for five to ten minutes. [B.P.] was in the home at the time of [Stepfather's] infliction of injuries to Maximus. By permitting [Stepfather] to live in the home and have unrestricted access to [B.P.], [M]other has endangered [B.P.] and created a detrimental home environment and place[d] [B.P.] at risk of serious physical harm, damage[,] and danger."

The juvenile court explained the rationale for the amendments as follows: "The concern expressed in the amended b-1 [and] j-1 [counts is] that [Stepfather], the father of the deceased half-sibling, Maximus, has admitted to taking actions that could very well be considered inappropriate and dangerous to [Maximus], whether or not they caused the death, contributed to the death. [¶] And the concern of the court is that this person was living in the home of [B.P.], and has admitted himself that he got angry, lost control, and forcefully pulled the baby side-by-side by his arms and legs for five to ten minutes. . . . [¶] . . . [¶] I don't think there is any way in which the forceful pulling side-to-side by arms and legs is the appropriate way to treat a child. Whether it results in visible injuries or not." None of the parties objected to the court's proposed amendments.

Turning to the presentation of evidence on the remaining amended petition counts, Mother presented expert testimony from Dr. Perry Lubens (Lubens), a board-certified pediatrician and clinical neurophysiologist with a special competence in child

neurology.[7]  Based on his review of Maximus's medical records, including the MRI studies, Dr. Lubens opined Maximus "most likely" suffered from an "intra-abdominal catastrophe," possibly a "mid-gut volvulus," which resulted in Maximus's severe anemia. The anemia, in turn, caused the cardiac arrest, which deprived his brain of blood, leading Maximus to suffer "irreversible brain injury."

Lubens further opined the reperfusion hemorrhaging evident on the imaging studies was not the result of non-accidental trauma.  Rather, the hemorrhaging was due to the cardiac arrest:  "There was [a] lack of blood and oxygen supplied to the brain.  When that happens neurons die[ ].  In other words, the working part of the brain dies.  And also the whole blood vessel network in the brain, capillaries and blood vessels are injured.  They don't hold the blood within the blood vessels anymore.  They leak.  When . . . [Maximus] was resuscitated and the heart got going again some of that blood leaked out of these leaky vessels into the subarachnoid space and that cause[d] the subarachnoid hemorrhage."  Based on his review of the medical records, Lubens "did not find any evidence that [Maximus] had been shaken from five to ten minutes."  In response to a question from the court, Lubens stated there was nothing in the autopsy report with which he disagreed.

Following oral argument, the juvenile court dismissed the amended b-1 count in the petition and sustained the subdivision j-1 count because that count, in the court's view, more closely described B.P.'s situation.  As the court explained it, B.P.'s half-

---

[7]     Lubens's curriculum vitae, the only document offered by Mother, was admitted in evidence by the juvenile court.

13

sibling Maximus was "abused by [Stepfather]. Whether or not it caused the death, we don't know. But we do have confessions made by [Stepfather]. He has recanted. But I do believe that [the] confessions made more contemporaneous to the events are more credible. [¶] And frankly[,] I think the risk continues because Mother has not ended her relationship with [Stepfather] [following his arrest]. And should [Stepfather] be released from prison, we don't have any assurance that he would not move back into the home and [Mother] will be appropriately protective of [B.P.]." Neither Mother nor any other party objected to the legal sufficiency of the court's finding on the subdivision j-1 count.

After the jurisdiction ruling, Mother opted to testify during the disposition phase of the hearing. She agreed she was aware of Stepfather's confession and arrest but she maintained Stepfather posed no risk to B.P. Mother claimed she had decided not to continue her relationship with Stepfather, but she admitted she had not yet advised him of her decision. Mother also testified she had been in regular telephonic contact with Stepfather since his arrest: in the four weeks preceding the hearing, she spoke with him on four to five occasions, the last time being two days before the hearing.

The juvenile court was "not reassured" by Mother's testimony, highlighting her statement that she "maintained contact with [Stepfather] during this period despite the fact that . . . he is in custody for possibly having some culpability in the death of their shared child." The court also doubted Mother's honesty in testifying that she would not continue her relationship with Stepfather because it appeared to the court that "the only reason [Mother] said she would not talk to him again was because that was what she thought the court would say." The

14

court also was unsure whether Stepfather would remain in custody on the arrest charge and for how long. The court found Mother did not understand the risk Stepfather's access to B.P. posed and removed B.P. from Mother's custody and ordered B.P. released to the home of Father. Because B.P. was "closely connected" to Mother and because Mother did not pose a direct risk to B.P., however, the court ordered unmonitored visits for Mother provided that Stepfather was not present.

## II. DISCUSSION

Mother advances a legal contention—the juvenile court's section 300, subdivision (j) jurisdiction finding is infirm because the court did not expressly find Maximus was neglected or abused under one of the other pertinent section 300 subdivisions—as well as several sufficiency of the evidence claims pertaining to both the jurisdiction and disposition rulings. All are meritless. As we go on to explain: the legal contention is forfeited and, in any event, wrong on the law; Stepfather's admission that he abused Maximus, plus other evidence of his impatience with children and violent outbursts when frustrated, is substantial evidence of abuse or neglect of Maximus; Mother's continued contact with Stepfather after his admission and Stepfather's hostile remark about B.P. are substantial evidence of a substantial risk to B.P.'s welfare; and this same evidence, particularly Mother's continued contact with Stepfather, is substantial evidence justifying the court's decision to remove B.P. from Mother's custody.

15

*A.    Mother's Failure to Object to the Legal Sufficiency of the Jurisdiction Finding Forfeits the Issue and the Contention Is Not Well Taken in Any Event*

Section 300, subdivision (j), authorizes a juvenile court to assume dependency jurisdiction over a child when the following two requirements are met: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

Mother maintains the juvenile court erred by failing to make an express finding that Maximus was abused or neglected under any of the predicate subdivisions referenced in subdivision (j).  Mother, however, never raised this argument in the proceedings below.  In fact, the record shows Mother never objected to the amended subdivision j-1 count on any ground at any time (either before or after the count was sustained).  That forfeits the point on appeal.  (*In re David H.* (2008) 165 Cal.App.4th 1626, 1640 ["Allowing parties to challenge the facial sufficiency of a petition for the first time on appeal conflicts with the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail.  [Citation.] Enforcing the forfeiture rule requires parties to raise such issues in the juvenile court where they can be promptly remedied without undue prejudice to the interests of any of the parties involved"]; accord, *In re Ashley B.* (2011) 202 Cal.App.4th 968, 980, fn. 4 (*Ashley B.*); *In re Christopher C.* (2010) 182 Cal.App.4th 73, 81-83.)

Even if not forfeited, the argument would be unpersuasive. "On its face, section 300, subdivision (j) does not require that the

16

court make an express finding under section 300 as to the subject child's sibling. Where, as here, the abused or neglected sibling is deceased, the trial court need not sustain predicate findings on behalf of the deceased sibling. Under these circumstances, it is sufficient that the juvenile court made an implied finding that the deceased sibling was abused or neglected as defined in one of the enumerated subdivisions of section 300." (*Ashley B.*, *supra*, 202 Cal.App.4th at 980; see also *I.J.*, *supra*, 56 Cal.4th at 774 ["'Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions'"].)

B. *Substantial Evidence Supports the Juvenile Court's Jurisdiction Finding Under Section 300, Subdivision (j)*

Subdivision (j) of section 300 "'was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) *does not* state that its application is limited to the risk that the child will be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) or (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at 774.)

Subdivision (j), in contrast to its predicate subdivisions, lists factors for the court to consider. It states: "The court shall

17

consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) "'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at 774.)

Our review of a challenge to the sufficiency of the evidence to support a juvenile court's section 300, subdivision (j) finding is for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633 ["'In reviewing the jurisdictional findings . . . , we look to see if substantial evidence, contradicted or uncontradicted, supports them'"].) Here, the substantial evidence standard is met with respect to both elements of a section 300, subdivision (j) finding.

With regard to the first (proof that one or more of the B.P.'s siblings was abused or neglected), Stepfather admitted to the polygraph examiner that he grew frustrated with Maximus, lost control of himself, and pulled the infant's arms and legs forcefully for five to ten minutes. The juvenile court opted to believe Stepfather's admission over his subsequent recantation, and understandably so. While that alone is adequate evidence of predicate abuse of a sibling, there was more: undisputed evidence that Stepfather would become inpatient and frustrated when in

18

the presence of crying children (Mother had to relieve him from caring for Maximus when he was crying and Stepfather slammed a door when Aldo's child was crying), evidence that Maximus was crying and "fussy" on the day in question when Mother was in the shower and unavailable, and evidence that Stepfather would occasionally lash out violently (slamming walls and doors) when frustrated.

As for the second element of a section 300, subdivision (j) showing (establishing B.P. was at substantial risk of abuse or neglect at the time of the jurisdiction hearing), that too was satisfied by substantial evidence. (*I.J.*, *supra*, 56 Cal.4th at 773 [a juvenile court "'need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child'"].) B.P. was present in the home at the time Stepfather confessed to abusing Maximus. Stepfather had made a hostile comment about B.P. when leaving a voicemail message for Father. Stepfather, as already recounted, would at times become frustrated while in the presence of children, including a child other than Maximus, and Stepfather at times reacted violently when frustrated. Mother also continued to maintain contact with Stepfather even after his admission to abusing Maximus. There was no guarantee, as the juvenile court observed, that Stepfather would remain in custody after his arrest, and the juvenile court was entitled to disbelieve Mother's professed intention to end her relationship with Stepfather— particularly since Mother never advised Stepfather of that decision and instead continued to talk with him regularly by telephone, including as late as two days before the jurisdiction hearing.

19

### C. Substantial Evidence Supports the Juvenile Court's Order Removing B.P. from Mother's Custody

"[A] dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328.) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.) We review a removal order for substantial evidence. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

The evidence supporting the juvenile court's exercise of dependency jurisdiction under section 300, subdivision (j) that we have already recounted is sufficiently strong to support the order removing B.P. from Mother's custody. Particularly relevant are Stepfather's admission to abusing Maximus, his propensity toward frustration around children, and his continued contact with Mother. Mother argues, however, that substantial evidence did not support the removal order because Stepfather was still

20

incarcerated at the time of the hearing. The point is unpersuasive. (See, e.g., *In re Carlos T.* (2009) 174 Cal.App.4th 795, 806 [holding there was a substantial risk of future harm because a father who had been convicted of sexually abusing one of the children in question had not yet been sentenced or exhausted his appeals; consequently, "there [wa]s a possibility that [the] father would be released from custody and . . . resume his . . . abuse"].) Mother also claims (in just three sentences) that the juvenile court "should have considered whether there were reasonable means to prevent removal, such as ordering frequent home visits and offering family preservation services to verify [B.P.'s] safety . . . ." Assuming the contention is adequately presented, it is not a challenge to the sufficiency of the evidence but rather a challenge to what the court assertedly failed to consider—and it is forfeited for lack of an objection in the juvenile court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1346.)

## DISPOSITION

The juvenile court's jurisdiction finding and disposition order are affirmed.  The Department's cross-appeal is dismissed as nonjusticiable.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.


We concur:



MOOR, J.



KIM, J.