Filed 3/4/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | B312391<br>(Los Angeles County<br>Super. Ct. No. 20CCJP01943) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ALEXANDER C.,<br><br>　　　　Defendant and Appellant. | |

APPEAL from the jurisdictional and dispositional orders of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed with instructions.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

It is undisputed that the Los Angeles County Department of Children and Family Services (DCFS) failed to ask extended family members about Indian ancestry in derogation of state law (Welf. & Inst. Code, § 224.2)[1] implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq).  The only issue before us is whether that failure was prejudicial.  This is father's sole appellate challenge to the juvenile court's jurisdictional and dispositional orders regarding his son, A.C.  Defining prejudice can sometimes resemble Lewis Carroll's description of logic in Through the Looking-Glass:  " '[I]f it was so, it might be; and if it were so, it would be but as it isn't, it ain't.' "  (Carroll, Alice's Adventures in Wonderland and Through the Looking-Glass (1998) p. 157.)

As eloquently summarized in the dissent, recent appellate jurisprudence has adopted a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA ranging from a per se rule that any error is

_____

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

2

always prejudicial, to a test advocated by the dissent finding no prejudice unless the appealing parent makes a proffer that interviewing extended family members would yield information about potential Indian ancestry. We acknowledge the policy arguments in favor of this latter test not the least of which is preventing the delay caused by remanding a case for additional inquiry into a child's Indian status and the resulting inability to comply with competing statutory obligations expeditiously to provide a safe and permanent home for children within the juvenile court's jurisdiction.

We conclude, however, under the facts of this case, that DCFS's failure to ask extended family members about potential Indian ancestry was prejudicial. The dictates of our high court and mandatory statutory duties of initial inquiry compel this conclusion. Our conclusion, moreover, is consistent with the very purpose of ICWA—to remedy a history of removal of Indian children from their communities and cultural heritage.

Accordingly, we remand the matter with directions for the juvenile court to order DCFS to comply with section 224.2.

## BACKGROUND

1. *The Juvenile Court Assumed Jurisdiction Over the Children*[2]

For an undisclosed period prior to her 18th birthday, mother, who was born in 1985, was in foster care. Mother has

---

[2] Because the sole issue on appeal is compliance with the state statute implementing ICWA, a detailed recitation of the non-ICWA related background is not necessary to the resolution of this appeal. Additionally, we focus only on A.C. (not T.F. or

three children, T.F. (born in 2009), S.F. (born in 2011), and A.C. (born in 2017). Father is A.C.'s father. At the time the dependency proceedings commenced, the children were living with mother, and mother reported that father helped with A.C.

### a. Section 300 petition

DCFS became involved with the family after mother drove while under the influence of alcohol and collided with another vehicle. The children were in mother's car during this collision.

DCFS filed a section 300 petition, and the juvenile court sustained allegations that A.C. was at risk of suffering serious physical harm based on mother driving while under the influence. The juvenile court allowed the children to remain in mother's care. As part of the case plan dated July 7, 2020, the court recommended father take parenting classes. The juvenile court ordered that father's visits occur in mother's home unless father participated in an interview with social workers and an assessment of his home. The juvenile court ordered mother to attend a six-month drug and alcohol program and to undergo random drug testing every other week. The court also ordered mother to attend parenting classes and to cooperate with DCFS for unannounced home visits.

### b. Section 360 petition

On December 18, 2020, DCFS filed a section 360 petition alleging that the original disposition was ineffective in ameliorating the situation that required jurisdiction. Mother failed to comply with random drug testing. DCFS alleged that

S.F.) because father's argument concerns only A.C. Mother is not a party to the appeal.

4

mother has a history of alcohol use and currently abused marijuana. DCFS further alleged that father failed to comply with court orders, including participating in parenting classes.

### c. Section 342 petition

On January 12, 2021, DCFS filed a section 342 petition alleging that domestic violence involving mother and father placed A.C. at substantial risk of suffering serious physical harm. DCFS also alleged A.C. was at substantial risk of harm based on father's abusive conduct, father's substance abuse, and mother's failure to protect A.C. from father.

Following a hearing at which father testified, the court sustained the section 360 and 342 petitions. The juvenile court ordered A.C. removed from parental custody and granted mother and father reunification services. The juvenile court ordered both parents to attend a drug and alcohol program, weekly random drug and alcohol testing, parenting classes, domestic violence programs, and individual counseling.

## 2. *Background on A.C.'s Indian Heritage*

A DCFS report dated April 8, 2020 indicates that mother "denied the family [has] any known Indian Ancestry . . . ." but DCFS nevertheless concluded for unidentified reasons that ICWA "may apply." The record does not indicate that social workers asked father about potential Indian ancestry.

Mother completed a form indicating she had no known Indian ancestry. The form states, "Note: This form is not intended to constitute a complete inquiry into Indian heritage. Further inquiry may be required by the Indian Child Welfare Act." Father also completed a form (different from the one mother completed), checking the box, "None of the above apply."

5

The "above" unchecked boxes describing Indian ancestry were as follows: (1) "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe"; (2) "The child is or may be a member of, or eligible for membership in, a federally recognized Indian tribe"; (3) "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe"; (4) "I am a resident of or am domiciled on a reservation, rancheria, Alaska Native village, or other tribal trust land"; (5) "The child is a resident of or is domiciled on a reservation, rancheria, Alaska Native village, or other tribal trust land"; (6) "The child is or has been a ward of a tribal court"; and (7) "Either parent or the child possesses an Indian identification card indicating membership or citizenship in an Indian tribe." Father's form also stated, "Note: This form is not intended to constitute a complete inquiry into Indian heritage. Further inquiry may be required by the Indian Child Welfare Act."

In December 2020, DCFS reported that T.F. and A.C. were placed with a maternal aunt and S.F. was placed with a different maternal aunt. The record does not indicate that social workers asked maternal relatives about Indian ancestry. The January 15, 2021 report indicated that T.F. and A.C. were placed with a maternal cousin and S.F. was placed with a maternal aunt. There is no indication that DCFS interviewed either the maternal cousin or maternal aunt about A.C.'s potential Indian heritage.

After making interim findings that ICWA did not apply, on January 15, 2021, the juvenile court again concluded that ICWA did not apply, reasoning: Father "submits his ICWA-020 form. And the court reviews his ICWA-020 form. He indicates he

6

has no American Indian heritage." "[O]n mother's original WIC 300 petition, mother had submitted her ICWA-020 form. And she indicated that she had no American Indian heritage. [¶] So as to the child [A.C.] . . . , the court has no reason to know that this is an Indian child as described by the Indian Child Welfare Act, or no reason to believe, based on both parents submitting executed ICWA-020 forms denying American Indian heritage."

## DISCUSSION

Father argues DCFS's failure to satisfy its statutory duty of initial inquiry as to extended family members was prejudicial. His argument is well-taken.

### A.    Legal Background

ICWA is about Indian patrimony. "The ICWA was designed to remedy a unique and longstanding record of child welfare abuses by federal and state officials, state court judges, and private adoption agencies that led to widespread removal of Indian children from their homes and communities. Extensive congressional hearings on the topic of Indian child welfare in the 1970s established that '[t]he wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' [Citation.]" (Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance* (2002) 51 Emory L.J. 587, 601.) "ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian

7

child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881 (*Austin J.*).)

Given this history, ICWA and related state legislation collectively impose obligations on the juvenile court and child welfare agencies to cull information from the parents and extended family members about potential Indian ancestry. These are mandatory duties commensurate with the importance of ICWA's remedial goals.

California law requires at the outset of a dependency case that the child welfare agency and juvenile court inquire into whether a child is, or may be an Indian child. "The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'" (*Austin J.*, *supra*, 47 Cal.App.5th at p. 883, quoting § 224.2, subd. (b), italics added; see also Cal. Rules of Court, rule 5.481(a).)

Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. 1903(2).)

In this case, DCFS failed to comply with its "obligation to make a meaningful effort to . . . interview extended family members to obtain whatever information they may have as to the

8

child's possible Indian status." **3** (*In re K.R.* (2018) 20 Cal.App.5th 701, 709; see also *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402 [state law requires DCFS to inquire of extended family members whether child may be Indian child]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742 [same].) When during the proceedings, the children were placed with mother's extended family, DCFS did not ask mother's relatives about A.C.'s potential Indian heritage. Father lived with his mother and brother. DCFS did not ask them either about A.C.'s potential Indian heritage. Yet early on, these relatives were readily available to consult regarding Indian ancestry.

The juvenile court merely relied on mother's and father's ICWA forms in concluding A.C. is not an Indian child.**4** The

---

**3** California law imposes a duty of further inquiry regarding Indian ancestry when the court, social worker or probation officer "has reason to believe that an Indian child is involved in a proceeding . . . ." (§ 224.2, subd. (e); see *Austin J.*, *supra*, 47 Cal.App.5th at p. 883.) Federal and California law require that notice be given to the relevant Indian tribe "when 'the court knows or has reason to know that an Indian child is involved.' (25 U.S.C. § 1912(a); see also Welf. & Inst. Code, § 224.3, subd. (a) [if 'the court, a social worker, or probation officer knows or has reason to know . . . that an Indian child is involved' in the dependency proceeding, 'notice shall be sent to the [child's] parents or legal guardian, Indian custodian, if any, and the child's tribe']; Cal. Rules of Court, rule 5.481(b)(1).)" (*Austin J.*, *supra*, at p. 884.) None of these additional statutory duties is at issue in this appeal.

**4** Father argues that the Judicial Council form he signed is incomplete because it focuses on reason to know that the child is an Indian child rather than reason to believe the child is an

ICWA forms themselves state that the form "is not intended to constitute a complete inquiry into Indian heritage"; this case involved no further inquiry. Here, mother was the product of foster care and thus may not have known her cultural heritage. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) The same may not have been true of her biological relatives. One of the detention reports also indicated that A.C. may be an Indian child. We thus cannot conclude from this equivocal record that DCFS's failure to conduct *any* inquiry as to mother and father's extended family members was not prejudicial.

The dissent effectively catalogues the different standards of prejudice appellate courts have applied. It thoughtfully sets forth the policy reasons why appellant should be required to make an offer of proof of potential Indian ancestry before remanding a case for the purpose of asking extended family members about Indian ancestry. The dissent cites delay in permanency visited upon children in dependency courts whenever a case is remanded for further ICWA inquiry, and the resulting negative impact on juvenile court funding.

The dissent concludes that to obtain a remand for further ICWA inquiry, appellant must, in effect, make a proffer that a relative has information about Indian ancestry. Indeed, the dissent goes further to argue that it should be the obligation of a parent's trial counsel to ask parents and extended family members about Indian ancestry with the implication that

---

Indian child. Father also argues that DCFS and the juvenile court failed to comply with other statutory requirements related to asking mother and father about their Indian ancestry. These arguments are moot in light of our disposition.

imposing this obligation on trial counsel would preclude finding prejudice on appeal.

We do not quarrel with the policy arguments the dissent so elegantly elucidates. These arguments are grist for the legislative mill. They, however, do not detract from our high court's guidance in *In re Isaiah W.* underscoring the importance of ICWA's goals despite the delay in permanency caused by enforcing ICWA's and related state law requirements. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 12–15.)

Thus, in *Isaiah W.,* the Supreme Court permitted a parent to challenge ICWA compliance in an appeal from an order terminating parental rights even though the parent did not appeal from an earlier dispositional order finding that ICWA did not apply and placing the child in foster care. (*In re Isaiah W.*, *supra*, 1 Cal.5th at p. 6.) The Supreme Court remanded the matter for further ICWA inquiry notwithstanding the ensuing delay in a permanent home for the child. (*Id.* at p. 15.)

As our high court observed: "We are mindful of the child's need for a permanent and stable home, and we agree that swift and early resolution of ICWA notice issues is ideal. But the federal and state statutes were clearly written to protect the integrity and stability of Indian tribes despite the potential for delay in placing a child. The provisions of the California statute just discussed, as well as others, recognize the importance of properly determining a child's Indian status, even when a dependency proceeding has progressed beyond the initial stages." (*In re Isaiah W.*, *supra*, 1 Cal.5th at p. 12.) The statutes and regulations implementing ICWA, moreover, expressly require that the juvenile court and child welfare agency (and not parents'

11

counsel) inquire about a child's potential Indian ancestry. (§ 224.2; 25 C.F.R. § 23.107(a).)

Unlike in *In re S.S.* (Feb. 24, 2022, B314043) ___ Cal.App.5th ___ [2022 WL 556884] and *In re Darian R.* (Feb. 24, 2022, B314783) ___Cal.App.5th ___ [2022 WL 556905], the record reveals readily obtainable information that was likely to bear meaningfully on whether A.C. was an Indian child. As noted above, mother, as a foster care product, may not know her cultural heritage, but her biological relatives may have that information. As also previously noted, although a detention report indicated A.C. may be an Indian child, the record is devoid of any follow-up on that representation. We thus cannot assume that the parents' mere denial of Indian ancestry on a form was sufficient to dispel prejudice from DCFS's failure to ask A.C.'s extended family members about potential Indian ancestry.

By remanding here today, we do not advocate a wooden approach to prejudice. In *In re Darian R.*, we held that interviewing extended family members would not have shed meaningful light on whether three dependent children were Indian children when "[t]here was a prior juvenile court finding that two of [the] children [sharing the same biologic parents as the child at issue] are not Indian children, the juvenile court asked mother, father, and paternal aunt about Indian ancestry, both parents eschewed Indian ancestry, and mother was living with extended family members whom she could have asked about potential Indian ancestry." (*Supra*, ___ Cal.App.5th at p. ___ [2022 WL 556905 at p. *1].) Similarly, in *In re S.S.*, we found the failure to interview maternal grandmother was not prejudicial where maternal grandmother requested placement of the dependent child in her care but never revealed any Indian

12

ancestry throughout the dependency proceedings, despite having every incentive to do so. (*Supra*, ___ Cal.App.5th at p. ___ [2022 WL 556884 at p. *4].)

Put simply, we are tasked with important, but competing legislative mandates. Prejudice must be viewed through this multi-faceted legislative prism. (See *Willis v. State of California* (1994) 22 Cal.App.4th 287, 293 ["We must follow the language used by the Legislature 'whatever may be thought of the wisdom, expediency, or policy of the' " law.].)

## DISPOSITION

The jurisdiction and disposition orders concerning A.C. are affirmed with instructions. The case is remanded to the trial court to comply with Welfare and Institutions Code section 224.2. The juvenile court shall order that within 30 days of the remittitur, DCFS report its investigation of A.C.'s potential Indian ancestry by interviewing available extended family members.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


I concur:


ROTHSCHILD, P. J.

13

CRANDALL, J.,* Concurring and Dissenting.

For the better part of two decades appellate courts have wrestled with the "harmless error" doctrine in the context of inquiries by social workers and juvenile courts regarding a dependent child's potential Native American status. What to do when such inquiries fall below enumerated statutory standards presents a complex question positing the explicit commands of California dependency laws against the laudable goals of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). The problem is not going to go away soon; indeed, the appellate dockets seem to be burgeoning with such cases.

There are powerful arguments on both sides. On the one hand, our state recognizes that a child needs prompt resolution of his or her custody status and a stable environment, and that prolonged temporary placements are damaging. (Welf. & Inst. Code,[1] § 352, subd. (a)(1); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 16 (dis. opn. of Chin, J.) [describing negative effects of delay on both the child and the tribe including that " '[c]hildhood is fleeting and "[i]t is axiomatic, of course, that the longer children remain in foster homes, the more difficult it is to find families willing to adopt them" ' "].) Juvenile courts are therefore admonished to proceed to disposition no later than 60 days after the initial detention hearing. (§ 352, subd. (b).) These and other bedrock timelines provide children who have been taken away from their parents with the permanence and stability to which they are legally entitled. (See *id.*, subd. (a); *Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 197; *In re Sean E.* (1992) 3 Cal.App.4th 1594, 1597.) The deadlines are to be extended only for "good cause" and/or "exceptional circumstances." (§ 352, subds. (a)(2), (b).) A juvenile court's failure to meet these deadlines can also jeopardize vital funding provided by the federal government to the State of California. (See 42

---

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code, unless otherwise stated.

U.S.C. §§ 671(a)(15), 672(a), 675(1)(E); see also *New York v. U.S. Dept. of Health and Human* (2d Cir. 2009) 556 F.3d 90, 100.)

On the other side of the equation, the ICWA's purpose is "to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881.) Accordingly, while "mindful of the child's need for a permanent and stable home," the California Supreme Court has cautioned that the ICWA and related California statutes "were clearly written to protect the integrity and stability of Indian tribes despite the potential for delay in placing a child." (*In re Isaiah W.*, *supra*, 1 Cal.5th at p. 12; see *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1338, citing 25 U.S.C. § 1901(3) ["there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"]; cf. *In re Isaiah W.*, *supra*, at p. 18 (dis. opn. of Chin, J.) [observing that delay also places the tribe in a difficult position "of having to urge that a child be removed from a long-standing foster care relationship"].) Consequently, juvenile courts are directed *not* to proceed with dispositional and other post-dispositional hearings absent ICWA compliance, even though these courts have little control over when "extended family members" might come forward with information regarding Native American ancestry, or how tribes may respond to ICWA notices. (See, e.g., *In re N.D.* (2020) 46 Cal.App.5th 620, 623 [finding juvenile court not authorized to proceed with foster placement absent ICWA compliance]; *In re Desiree F.* (2000) 83 Cal.App.4th 460, 474-475 ["[S]tate courts have no jurisdiction to proceed with dependency proceedings involving a possible Indian child until a period of at least 10 days after the *receipt* of such notice. The notice requirement is not satisfied unless there is strict adherence to the federal statute"].)

As someone who handled a busy dependency calendar for the three and a half years immediately preceding this assignment, it is hard to understate the havoc, expense, and uncertainty caused by these

2

conflicting mandates.[2]  The recent dissent of Acting Presiding Justice Lamar Baker in *In re H.V., supra,* ___ Cal.App.5th ___ [2022 WL 499730], pointedly discusses the "unpredictability in the law," the real impact to the Los Angeles County Department of Children and Family Services' (Department) "core mission of keeping children healthy and safe," and the disutility of requiring "child services agencies to undertake exhaustive efforts to run down even the most remote,

---

[2] Appellate courts have struggled mightily with the permanency/ICWA dichotomy.  As one way of attempting to reconcile these conflicting duties, appellate courts currently are resorting to dispositional orders, i.e., "conditional affirmances" or "conditional reversals," that require the ICWA inquiry without supposedly upsetting the permanency applecart.  (See *In re H.V.* (Feb. 18, 2022, B312153) ___ Cal.App.5th ___ [2022 WL 499730 at p. *3] [conditionally affirming dispositional order]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 746 [conditionally reversing order terminating parental rights] (*Benjamin M.*); *In re N.D.* (2020) 46 Cal.App.5th 620, 622 [conditionally reversing dispositional order]; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 788 [conditionally affirming order terminating parental rights].)  However, such dispositions not only contravene the very nature of a *final* judgment (see *Sontag Chain Stores Co. v. Superior Court* (1941) 18 Cal.2d 92, 94 ["there must be an end to litigation, and hence it is the long established policy of the law to, so far as possible, prohibit the further contest of an issue once judicially decided and to accord finality to judgments"]; 2 Witkin, Cal. Procedure (2022) Jurisdiction, § 432 ["Jurisdiction over a cause or parties after a final judgment, order, or decree is exceptional and limited to special situations"]) but, to be sure, cause juvenile courts considerable consternation upon remand.  For example, does a conditional reversal for the ICWA inquiry truly prevent an aggrieved parent from filing a section 388 petition to recommence services based upon that parent's progress since the date of the section 366.26 hearing?  Does the "conditional reversal" preclude a parent from attempting to prove that the previously "changing" circumstances should now be considered fully "changed" based upon the additional substantial passage of time?  How would an appellate court rule if that petition were denied?  Juvenile judges are left without guidance on these questions, which will create further uncertainty and appellate review.

3

unlikely possibility of Indian heritage such that the agencies functionally end up trying to prove a negative." (*Id.* at p. ___ (dis. opn. of Baker, J.) [2022 WL 499730 at p. *4].) His assessment is spot on.

Practically speaking, if we must cast the initial ICWA inquiry far and wide to include "extended family members," and combine it with the ability to raise a failure of the process at any point in the case (including on appeal), then we *must*, I propose, continue to apply a "harmless error" standard that places some reasonable burden on the appealing party to show prejudice based upon the Department's incomplete ICWA inquiry.[3] (*People v. Watson* (1956) 46 Cal.2d 818.)

This case aptly illustrates the problem of presuming prejudicial error.[4] Alexander C. (Father) represented to the court via an ICWA-020 Judicial Council form that neither he, his child, his parents, his

---

[3] The Department's failure to comply with its affirmative statutory duty of initial inquiry of "extended family members" under the 2019 amendments to section 224.2 (*id.*, subd. (b); cf. 25 C.F.R. § 23.107(a)) immediately begs the question of the appropriate standard of review to employ when such error occurs. Neither the California Supreme Court nor the Legislature has weighed in on this issue. Thus, we may, without contravening the "language used by the Legislature" (*Willis v. State of California* (1994) 22 Cal.App.4th 287, 293), urge the continued application of the *Watson* harmless error standard. And although the procedural posture of this case is an appeal from a dispositional order and does not, at present, involve either termination of services or of parental rights, there is no reason why the "harmless error" analysis should not be identical in either circumstance.

[4] The "third option" of *sometimes* finding presumed prejudice, adopted by the *Benjamin M.* court and followed in this case, does not provide a workable solution to the ICWA dilemma but merely shifts the appellate battleground to whether there was "readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child" and whether "the probability of obtaining meaningful information is reasonable." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Aside from continuing to foment appeals, there are multiple situations, easy to visualize, in which *Benjamin M.*'s test would lead to inconsistencies with *Watson*.

4

grandparents, or his lineal ancestors were members or eligible for membership of a federally-recognized Indian tribe; that neither he nor his child were residents of or domiciled on a reservation, ranchera, Alaskan Native Village, or other tribal trust land; and that neither he nor his child possessed an Indian identification card demonstrating membership or citizenship in an Indian tribe. The form admonished Father to provide any new information on the topic to the court.[5] Father remained silent. Thus, the juvenile court had information upon which it could (and did) conclude that A.C. was likely not an Indian child, certainly stemming from his paternal relations.

To carry the point one step further, Father has made no claim, either in the juvenile court or on this appeal that, had the juvenile court or the Department continued to ask him or the mother about A.C.'s Indian status, or made inquiries of A.C.'s extended family members about A.C.'s Indian status, they would have discovered information triggering the need for further ICWA inquiry or notice.

There being no information in the record whatsoever that A.C. might indeed be an Indian child, case law (at least until the recent past) fully supported a finding of an absence of prejudice and, commensurately, "harmless error." (See *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 ["The burden on an appealing parent to make an affirmative representation of Indian heritage is de minimis. In the absence of such a representation, there can be no prejudice and no miscarriage of justice requiring reversal"]; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162 ["any failure to comply with a higher state standard, above and beyond what the [federal] ICWA itself requires, must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error"]; see also *People v. Watson*, *supra*, 46 Cal.2d

---

[5] Although the form is unsigned, neither Father nor his counsel (in the juvenile court or on appeal) argues that the representations Father made on the form were incorrect. Counsel usually help a parent complete this form.

at p. 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; *In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is [the] appellant's burden to affirmatively show error' "].)

The most compelling arguments in favor of the "presumed prejudice" approach are that: (1) knowledge of Indian ancestry is not a matter wholly within an appealing parent's knowledge, and the Department's failure to conduct an adequate inquiry should not inure to its benefit (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743 [stating parents cannot always easily obtain such information]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [citing cases acknowledging parents "may not know their possible relationship with or connection to an Indian tribe"]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1075 (dis. opn. of Menetrez, J.) [disagreeing that knowledge of any Indian connection is wholly within the appealing parent's knowledge]); (2) "it is in part the tribe's right to a determination of a child's Indian ancestry, but the tribe is not present, and [thus,] the agency[, not the parent,] is charged with obtaining information to make that right meaningful" (*In re Benjamin M.*, *supra*, at p. 745); and (3) appellate courts are not supposed to consider facts outside the lower court record. (*In re A.C.*, *supra*, at p. 1077 (dis. opn. of Menetrez, J.) [citing *In re Zeth S.* (2003) 31 Cal.4th 396, 492 for the proposition that an appellate court should not look to postjudgment evidence to *reverse* a judgment because doing so undermines " 'the state's strong interest in the expeditiousness and finality of juvenile dependency proceedings' "]; see also *In re H.V.*, *supra*, ___ Cal.App.5th at p. ___ [2022 WL 499730 at p. *3] ["[The m]other does not have an affirmative duty to make a factual assertion on appeal that she cannot support with citations to the record"].)

Whatever may be said of the Department's affirmative duty to investigate, we should also expect *parents' counsel* to actively pursue a child's Native American status, both in juvenile court and on appeal, by

6

timely inquiring of their own client and contacting any "extended family members" that either they or their client might identify. If these efforts were expected of counsel, the *Watson* standard likely could be met in situations where the child had a reasonable chance of actual tribal membership. However, in terms of fundamental fairness, it is untenable gamesmanship to allow a parent to stand idly by and then raise a "winning" ICWA issue on appeal merely by pointing out the Department's error in not speaking with a single extended family member.

Some have posited that appellate counsel are not paid to conduct investigations of facts outside the record. This questionable assumption could be readily mitigated if parents' *trial counsel* actively participated in identifying information relevant to the Indian child inquiry and making it part of the appellate record. After all, juvenile dependency proceedings are special proceedings (*In re Chantal S.* (1996) 13 Cal.4th 196, 200) for which "[t]he goal of . . . both trial and appellate [courts], is to safeguard the welfare of California's children." (*In re Josiah Z.* (2005) 36 Cal.4th 664, 673.) Dependency proceedings are collaborative to the extent that counsel for *all parties* understand that "[t]he best interests of the child are paramount." (*Ibid.*; see Cal. Rules of Court, rule 5.660(d)(1) [parties entitled to competent counsel, who have adequate knowledge of "the purposes and goals of dependency proceedings"].) Because "it is in the best interests of the child to retain tribal ties and cultural heritage" (*In re Desiree F., supra*, 83 Cal.App.4th at p. 469), parents' counsel, too, should be expected to fully and timely participate in the ongoing ICWA inquiry, even if the end result could be an earlier termination of their client's parental rights. Viewing the ICWA inquiry through an adversarial lens disserves both the child and the tribe.

Neither should we fret about appellate courts receiving evidence outside the lower court record. This restriction is not absolute. (Code Civ. Proc., § 909; *In re A.C., supra*, 65 Cal.App.5th at p. 1071; *In re B.D.* (2019) 35 Cal.App.5th 803, 809; see *In re Zeth S., supra*, 31 Cal.4th at pp. 399, 405, 413 [limiting consideration of new evidence by the

7

appellate court under Code Civ. Proc., § 909 to "exceptional" or "rare and compelling" circumstances].) Especially given the significant harm to the child caused by fruitless "extended family member" inquiries, we should acknowledge ICWA appeals relating to this issue as "rare and compelling" to the extent that appellate counsel must produce some evidence (either in conjunction with minor's counsel and/or the Department) overcoming the *Watson* standard of "harmless error." (*In re A.C.*, *supra*, 65 Cal.App.5th at pp. 1071, 1076 [recognizing that in " 'rare and compelling' " circumstances appellate courts may " 'receive and consider postjudgment evidence that was never before the juvenile court[ ] and rely on such evidence outside the record on appeal to reverse the judgment' "].) Again, we should insist upon rather than minimize or ignore the collaboration that often occurs in juvenile court.

We must remain mindful that ICWA's laudable purpose is rarely furthered by a remand where (as here) each parent has already affirmed that neither they, their child, their parents, grandparents, or lineal ancestors are or may be a member of an Indian tribe or eligible for membership in an Indian tribe, and no party raised any ICWA concerns in the juvenile court. Further, the ICWA definition of an Indian child is *narrow*, requiring either that the child or the child's biological parent be a member of an Indian tribe (25 U.S.C. § 1903).[6] Because such basic information is often known or easily discoverable by each respective parent, there is limited utility in remanding such matters for "extended family member" inquiry.

It also must be plainly stated that the presumption of prejudice (including *Benjamin M.*'s "third option" of "*sometimes* prejudice"), considered in conjunction with the Department's extraordinarily broad inquiry duty, provides parents with a last-minute, readily-available delay tactic. In this regard it is sometimes true that the temptation of

---

[6] Relatedly, section 224.1, subdivision (b), states in relevant part that "the term 'Indian child' also means an unmarried person who is 18 years of age or over, but under 21 years of age, who is a member of an Indian tribe or eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

a parent, or a parent's relative, to invent or exaggerate ICWA ancestry, can be overwhelming when the anticipated effect is to delay or defeat termination of parental rights. As pointed out by Justice Baker, "there are only so many hours in a day and only so many child services agency employees on the payroll. While these costs at even a high price are worth the benefit . . . , the costs swamp the benefits when courts read the statutory scheme [so expansively]" and when the result is the harmful postponement of a permanent, stable home for children in dependency court. (*In re H.V.*, *supra*, ___ Cal.App.5th at p. ___ (dis. opn. of Baker, J.) [2022 WL 499730 at p. *4]; see *In re Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431 ["In the absence of [a representation of some Indian connection sufficient to invoke the ICWA], the matter amounts to nothing more than trifling with the courts. . . . The ICWA is not a 'get out of jail free' card" by which parents should be permitted "to cause additional unwarranted delay and hardship, without any showing whatsoever that the interests protected by the ICWA are implicated in any way"].)

Balancing the often-conflicting interests of the child dependency statutory scheme against the ICWA, as well as the costs, and the limited utility of a remand, the better approach is to continue to place a burden on the appealing parent to make an affirmative representation of "a reason to believe" that the child is an Indian child. Without some offer of proof from Father that a "reason to believe" exists, the juvenile court's error was harmless, and remand is unwarranted.

Therefore, while I concur with the jurisdiction and disposition orders concerning A.C., I respectfully dissent with respect to the instructions and remand.

CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9